**ENVIRONMENTAL DEFENSE FUND, INC., et al., Petitioners,**

v.

**ENVIRONMENTAL PROTECTION AGENCY and William D. Ruckelshaus, Administrator, Respondents,**

Coahoma Chemical Company, Inc., Intervenors.

**ENVIRONMENTAL DEFENSE FUND, INC., Petitioners,**

v.

**ENVIRONMENTAL PROTECTION AGENCY and William D. Ruckelshaus, Administrator, Respondents.**

**COAHOMA CHEMICAL COMPANY et al., Petitioners,**

v.

**William D. RUCKELSHAUS, Administrator, Environmental Protection Agency, Respondent,**

EDF et al., Intervenors.

**OLIN CORPORATION, Petitioner,**

v.

**William D. RUCKELSHAUS, Administrator, Environmental Protection Agency, Respondent.**

**CAROLINA CHEMICALS, INC., et al., Petitioners,**

v.

**William D. RUCKELSHAUS, Administrator, Environmental Protection Agency, Respondent.**

**W. R. GRACE & CO. et al., Petitioners,**

v.

**William D. RUCKELSHAUS, Environmental Protection Agency, Respondent.**

**OCTAGON PROCESS, INC., Petitioner,**

v.

**William D. RUCKELSHAUS, Administrator of the Environmental Protection Agency, Respondent.**

Nos. 72–1548, 72–1690, 72–2142, 72–2183, 73–1015, 73–1088, 73–2070.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 5, 1973.

Decided Dec. 13, 1973.

John F. Dienelt, Washington, D. C., with whom William A. Butler, East Setauket, N. Y., was on the brief for petitioners in Nos. 72–1548 and 72–1690 and Environmental Defense Fund, Inc., and others, petitioners in No. 72–2142.

Robert L. Ackerly with whom Charles A. O'Connor, III, Washington, D. C., was on the brief for petitioners in Nos. 72–2142, 72–2183, 73–1015 and 73–2070.

Stephen F. Eilperin, Atty., Dept. of Justice with whom Walter H. Fleischer, Atty., Dept. of Justice and Blaine Field-

ing, Atty., Environmental Protection Agency, were on the brief for respondents. Alan S. Rosenthal, Atty., Dept. of Justice and Michael C. Farrar, Atty., Environmental Protection Agency also entered appearances for respondents.

Charles M. Crump, Memphis, Tenn., and Walkins C. Johnston, Montgomery, Ala., were on the brief for intervenors.

Before TAMM, ROBINSON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

Coahoma Chemical Company, the Environmental Defense Fund, and other parties seek review of the 14 June 1972 Order of the Administrator of the Environmental Protection Agency (EPA) which cancelled, effective 31 December 1972, almost all registrations for the use of DDT, except for limited public health and agricultural pest quarantine purposes.[1] Coahoma, along with other producers and users, challenges the Order as going too far in banning most uses of DDT; the Environmental Defense Fund (EDF) challenges the Order as not going far enough by allowing a few uses to remain.

## I. AGENCY ACTION

After a lengthy administrative review of DDT, a potent pesticide,[2] the Order of 14 June 1972 was promulgated. The EDF first sought cancellation of DDT registrations under the Federal Insecticide, Fungicide, and Rodenticide Act [FIFRA] in October 1969.[3] More than a year later, and after two cases challenging the lack of Government action had been brought in and decided by this court,[4] on 15 January 1971[5] the Administrator of EPA issued cancellation notices for all registrations of insecticides containing DDT. However, no suspension of use was required at this time.

EPA began evidentiary hearings on DDT in August 1971. A month later an Advisory Committee, appointed at the request of the registrants (i. e., users and producers) of DDT,[6] issued a report confirming the hazards caused by DDT and recommending suspension or rapid decrease in use. In one of several preliminary judicial skirmishes between the parties, this court ordered EPA to reconsider its decision not to suspend use of DDT pending the outcome of the cancellation proceedings;[7] reconsideration resulted in no change by EPA. We later in effect gave EPA a 15 April 1972 deadline before which to conduct meaningful administrative proceedings.[8]

The EPA hearings terminated in March 1972, after seven months of testimony from a broad spectrum of the pub-

1. Environmental Defense Fund (EDF) Appendix at 50.

2. The chemical name for DDT is 1,1,1-trichloro-2,2-bis (pchlorophenyl) ethane. EDF Appendix at 105.

3. 7 U.S.C. §§ 135–135k (1970). Originally FIFRA was enforced and administered by the Secretary of Agriculture. However, a reorganization in 1970 placed responsibility in the Administrator of EPA. See Reorganization Plan No. 3 of 1970, in Appendix to Title 5, U.S.C.

4. Environmental Defense Fund v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970) [The court granted EDF standing to contest the failure to cancel all DDT registrations and remanded to the Secretary of Agriculture to reconsider and give reasons.]; Environmental Defense Fund v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584 (1971) [The court directed the Administrator of EPA,

now in charge of FIFRA, to initiate cancellation proceedings because of substantial questions of safety of DDT, and to reconsider suspension of use.].

5. EPA PR Notice 71–1. Also TDE, a related chemical, suffered cancelled registrations by PR Notice 71–5.

6. FIFRA establishes an elaborate procedure for registrants who wish to challenge proposed cancellations. Registrants may request an advisory committee of scientific experts be selected by the National Academy of Sciences to review the proposed action. Additionally, registrants may file objections and request a public hearing. 7 U.S.C. § 135b(c). Both options were utilized here.

7. Environmental Defense Fund v. Ruckelshaus, Order (No. 71–1256, 22 Sept. 1971).

8. Environmental Defense Fund v. Ruckelshaus, Order (No. 71–1256, 9 Dec. 1971).

lic, and in April the Hearing Examiner[9] filed his Recommended Findings, Conclusions, and Orders.[10] The Hearing Examiner concluded that all cancellation notices should be withdrawn, and registrations of DDT should continue, except for non-military mothproofing and DDD fruit spray.[11]

The Administrator chose to review the case personally (instead of delegating this as he normally would to the Judicial Officer),[12] and after oral argument and written briefs concluded on 14 June 1972 that DDT was sufficiently dangerous to require its use to be banned for most purposes. The Administrator delayed the effective date of his Order for six months, so that users of DDT could be educated in the proper use of alternative pesticides.[13]

The statutory basis for the EPA action lies in the Federal Insecticide, Fungicide, and Rodenticide Act, FIFRA. This Act requires registration of every economic poison distributed or sold in the United States.[14] Registration is to be denied if the substance does not comply with the provisions of the Act,[15] and misbranding of the substance is a prohibited action.[16] Misbranding is defined in the statute to have occurred, "if in the case of an insecticide . . . when used as directed or in accordance with commonly recognized practice it shall be injurious to living man or other vertebrate animals, or vegetation, except weeds, to which it is applied, or to the person applying such economic poison.[17] A later formulation of this require-ment was incorporated in the Federal Environmental Pesticide Control Act of 1972, which requires denial of registration unless the substance "will perform its intended function without unreasonable adverse effects on the environment,"[18] and unless "when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment."[19] The FIFRA provisions further require that the order of the Administrator cancelling registrations must be based on substantial evidence of record developed at a hearing, if a public hearing is held, and the order must set forth detailed findings of fact.[20]

The Administrator's Order is challenged on two grounds: (1) is it based on substantial evidence in the record; (2) does it comply with the requirements of the National Environmental Policy Act (NEPA)? For the reasons explicated in Parts II and III below, to both questions our answer is affirmative.

## II.  JUDICIAL REVIEW OF THE ADMINISTRATOR'S ORDER

### A.  *The Test*

Explicitly established in the substantive legislation are the standards for judicial review. Once the Administrator has made a final order concerning the registration of a pesticide, that order is appealable to the United States Court of Appeals. The FIFRA statute directs the Court of Appeals to sustain the find-

---

9. The official title for the Hearing Examiner is now Administrative Law Judge. *See* 37 Fed.Reg. 16787 (1972); 5 C.F.R. § 930, Subpart B (1973).

10. EDF Appendix at 100.

11. Examiner's Proposed Orders, in EDF Appendix at 207–218.

12. *See* Brief of Respondent, William D. Ruckelshaus, et al., at 21.

13. *See* Brief of Petitioner, Environmental Defense Fund, et al., at 30.

14. 7 U.S.C. § 135b(a) (1970).

15. 7 U.S.C. § 135b(c).

16. 7 U.S.C. § 135a(a)(5).

17. 7 U.S.C. § 135(z)(2)(g).

18. 7 U.S.C. § 136a(c)(5)(C) (Supp. II, 1972).

19. 7 U.S.C. § 136a(c)(5)(D). The statute defines "unreasonable adverse effects" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

20. 7 U.S.C. § 135b(c) (1970).

ings of the Administrator with respect to questions of fact if "supported by substantial evidence when considered on the record as a whole."[21] The 1972 amendments further elaborate the scope of judicial review:

> The court shall consider all evidence of record. The order of the Administrator shall be sustained if it is supported by substantial evidence when considered on the record as a whole.[22]

The two versions provide standards of review which are somewhat different, in that the court under the 1970 language need only support *findings of fact* by the Administrator if based on substantial evidence, but the 1972 language requires the court to support *orders* of the Administrator which are based on substantial evidence. The 1972 amendment was enacted and effective on 21 October 1972, four months after the Administrator issued his Order in question here, but well before our judicial review. While the parties seem to assume that the 1970 version is controlling for purposes of our review,[23] the 1972 statute has no provision denying application to judicial review of prior orders of the Administrator. We read the 1972 amendment as establishing a standard effective for judicial review commencing after 21 October 1972, and therefore applicable in the case at bar.

In any event, the provisions for judicial review under both the 1970 and 1972 language clearly require the court to determine whether the findings of fact of the Administrator are based upon substantial evidence when considered on the record as a whole. Thus we must apply a traditional type of substantial evidence test, albeit one based on an extraordinarily voluminous record.[24] "Substantial evidence" was long ago defined by Chief Justice Hughes as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co v. NLRB.[25] And since the statute requires the whole record to be considered as in Universal Camera Corp. v. NLRB:

> The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. . . . [This does not mean] that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.[26]

The Supreme Court has more recently recognized in Consolo v. Federal Maritime Commission that there may be inconsistent conclusions which can be drawn from the same record, each of which may be supported by substantial evidence. Thus, "substantial evidence"

> is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.[27]

The Supreme Court went on to point out that the substantial evidence test "frees the reviewing courts of the time-consuming and difficult task of weighing the evidence, it gives proper respect to the expertise of the administrative tribunal and it helps promote the uniform

21. 7 U.S.C. § 135b(d) (1970).

22. 7 U.S.C. § 136n(b) (Supp. II, 1972).

23. Brief of Petitioner, Coahoma Chemical Co., at 15; Brief of Petitioner, EDF, at 32.

24. During seven months of hearings, 125 witnesses appeared to testify and 365 exhibits were placed in evidence. The transcript of the hearings was over 9,000 pages long.

Brief of Petitioner, Coahoma Chemical Co., at 5.

25. 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

26. 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

27. 383 U.S. 607, 620, 86 S.Ct. 1018, 1027, 16 L.Ed.2d 131 (1966).

application of the statute."[28] Other courts have stressed that where questions involve a special expertise of an agency, such as in detailed scientific proceedings, the agency deserves special deference from the courts, although careful review is of course always required.[29]

In the case at bar our task is made somewhat simpler than the agency's by adhering conscientiously to the proper scope of judicial review of administrative action, i. e., we as a court are confronted with a problem in administrative law, not in chemistry, biology, medicine, or ecology. It is the administrative agency which has been called upon to hear and evaluate testimony in all scientific fields relevant to its ultimate question of permission or prohibition of the sale and use of DDT. The EPA Administrator had an opportunity to make a careful study of the record of seven months of public hearings and the summaries of evidence prepared for him,[30] heard oral argument, and now has arrived at a decision to ban most uses of DDT. It is *his* decision which we must review; we are not to make the same decision ourselves. We are concerned with how he did it and on how much evidence. Since there is no challenge to procedure here, our problem narrows down to whether his decision is supported by substantial evidence based on the record as a whole.

### B. *The Evidence*

A review of the evidence in this case, as summarized by all the briefs, indicates that the situation is as described in *Consolo*: there is a great mass of often inconsistent evidence which was developed at the hearing; this evidence is substantial enough to support the conclusions of the Administrator, although it possibly might support contrary conclusions as well. Considering the evidence in the record as a whole, we cannot say that the Administrator's decision was not based on substantial evidence, even if the hazardous nature of DDT has not been proved beyond a reasonable doubt. Sufficient evidence has been adduced to show potentially great dangers from DDT, and the Administrator's decision to cancel the DDT registrations is well within his statutory authority.

Specifically, the Administrator states that DDT is hazardous because of several of its inherent properties: its persistence, mobility, and lipid solubility.[31] He contends that the alternatives to DDT do not have such properties, although he concedes that the alternatives may be more acutely toxic in the short run. He presents detailed evidence concerning the human hazards which may arise from DDT (carcinogenicity and mutagenicity of DDT), and also details the environmental hazards (effects on phytoplankton, beneficial agricultural insects, aquatic invertebrates, fish, and birds).[32] He concludes that an unacceptable risk to man and his environment is posed by continued use of DDT,[33] aside from the few carefully controlled uses concerning public health and agricultural quarantine purposes, which he permits.[34]

These findings and the evidence on which they are based are vigorously challenged by Coahoma and other DDT users. While their evidence might be sufficient to have allowed the Administrator to have decided the other way, and permit DDT to continue, their evi-

---

28. *Ibid.*

29. *See, e. g.,* Deutsch v. United States Atomic Energy Commn., 130 U.S.App.D.C. 339, 401 F.2d 404 (1968).

30. The public disclosure of these summaries is sought under the Freedom of Information Act, 5 U.S.C. § 552 (1970), in a companion case, Montrose Chemical Corp. v. Ruckelshaus, Nos. 73–1443 and 73–1444.

31. *See* Brief of Respondent, Ruckelshaus, at 28–43.

32. *See id.* at 43–85.

33. *See id.* at 86.

34. *See id.* at 106.

dence is not sufficient to vitiate the actual decision of the Administrator as not having been based on substantial evidence in the record as a whole.

■ Since the Administrator here decided contrary to the conclusions of the Hearing Examiner, the question arises concerning the proper deference to be given to the Hearing Examiner's report. As the Supreme Court indicated in *Universal Camera,* the hearing examiner's findings and opinion are to be considered as part of the evidence of record, both by the Administrator and by the reviewing court.

> We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The "substantial evidence" standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. . . . The significance of his report, of course, depends largely on the importance of credibility in the particular case.[35]

Later, in *FCC v. Allentown Broadcasting Corp.*[36] the Court indicated that where responsibility for decision was placed on the Board, it would be inconsistent to require the Board to adopt an examiner's findings unless rejection would be "clearly erroneous." However, the Court did not elaborate on the proper standard to be applied. Subsequent-

ly in an opinion by Judge Tamm in *Cinderella Career and Finishing Schools, Inc. v. FTC,* this Circuit held that the agency or administrator deciding a case "must consider [the decision of the examiner] and the evidence in the record upon which it is based, rather than dismissing the proceedings at the hearing out of hand." [37]

■ Applying the law to the facts at hand, we conclude that the Administrator has given sufficient weight to the hearing examiner's report. The Administrator reviewed the report of the examiner and the exceptions to the report filed by the EPA staff. He decided the case on the basis of the record developed at the hearings, additional briefs, oral argument, and specially prepared summaries.[38] The case appears to be one where the demeanor of witnesses is not particularly important, and where the examiner himself had no particular expertise, for he was a coal mine accident specialist.[39] The Administrator could derive a proper appreciation of the effect of cross-examination in the case by a reading of the record. Thus we conclude that sufficient weight was given to the examiner's report.

In another aspect of the question of the substantiality of the evidence, Coahoma, et al., urge that the Administrator's findings are insufficient in that they are based to a large extent on data which does not directly and specifically relate to the use of DDT to combat the boll weevil and the bollworm in the cotton growing areas of the Southeast.[40] It is true that much of the evidence in the record concerning dangers of DDT

---

35. 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951).

36. 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147 (1955).

37. 138 U.S.App.D.C. 152, 157, 425 F.2d 583, 588 (1970).

38. *See* note 30, *supra.*

39. Brief of Respondent, Ruckelshaus, at 16.

40. It appears that most of the DDT now in use in the United States is for control of cotton pests, primarily the bollworm. In fact, at least 70% of all DDT is used in the cotton-growing areas, especially the Southeast. Brief of Respondent, Ruckelshaus, at 86. The Intervenors, National Cotton Council of America, et al., suggest in their Brief at 4 that cotton accounts for an even greater percentage of use. Their figure of 99% reflects the cancellation of registrations for a variety of uses in 1969–1971.

does not specifically relate to this one area or to the use on cotton crops. However, it is not necessary to have evidence on such a specific use or area in order to be able to conclude on the basis of substantial evidence that the use of DDT in general is hazardous. The Administrator has pointed to evidence in the record showing that use of DDT except in minuscule amounts in highly controlled circumstances should be curtailed because of unreasonable risks to health and the environment.[41] Reliance on general data, consideration of laboratory experiments on animals, etc., provide a sufficient basis to support the Administrator's findings, even with regard to each special use of DDT.

On the other hand, EDF challenges the Administrator's decision to allow use of DDT in controlling certain public health problems or in agricultural quarantines as not being based on substantial evidence. Specifically EDF contends that there is no need to retain these uses of DDT, and that the usual dangers of DDT are present in these particular uses.[42] The Administrator finds that these uses may be necessary to combat potential, severe public health problems, and so DDT registrations for these purposes should be allowed. The necessity arises from the fact that alternative pesticides are also under EPA review, that situations may arise where the alternatives are not effective,[43] and that DDT must be available. Because the allowance of continued registration does not mean continued use, except where certified to be necessary, the Administrator concludes that the benefits of continued registration outweigh the risks inherent in such a minuscule use. This view has support in the record as a whole, and thus satisfies the substantial evidence test.

The entire Order of the Administrator is supported by substantial evidence when the record as a whole is considered. Under a proper application of the substantial evidence test, as formulated by the Supreme Court and by this Circuit, we affirm the Administrator's Order. We stress again that from an administrative law perspective we simply conclude that the Administrator's Order is adequately supported by evidence in the record. We do not decide whether we, ourselves, would ban DDT, nor should we so decide. We have, however, carefully reviewed the decision of the Administrator, and conclude that it should be affirmed.

## III. COMPLIANCE WITH THE NATIONAL ENVIRONMENTAL POLICY ACT OF 1969

The second challenge to the EPA's action raised by petitioners Coahoma Chemical Co., et al., concerns the failure of EPA to file a specific report under the National Environmental Policy Act of 1969 (NEPA). That statute requires that

> to the fullest extent possible . . . all agencies of the Federal Government shall . . . include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on —(i) the environmental impact of the proposed action. . . .[44]

41. *See* notes 32–34, *supra.* For the EPA's argument directed towards cotton pests, *see* Brief of Respondent, Ruckelshaus, at 86–99.

42. Brief of Petitioner, EDF, at 91–92.

43. Brief of Respondent, Ruckelshaus, at 106–107.

44. 42 U.S.C. § 4332(2)(C) (1970). The statement is required to include consideration of
    (i) the environmental impact of the proposed action,

> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
> *Id.*

This has been interpreted to require an agency to prepare an environmental impact statement whenever the agency's proposed action will have a significant effect on the environment.

There is little doubt but that the action of EPA in withdrawing DDT registrations will have a substantial effect on the human environment—indeed, that was the very purpose of the EPA action. The court is asked to consider two other, somewhat interrelated questions concerning NEPA. First, is the EPA an agency subject to the requirements of the statute when it undertakes environmental actions such as the cancellation of DDT registrations here? Second, has EPA in effect complied with the requirements, despite the lack of a formal NEPA impact statement?

Petitioners Coahoma Chemical Co., et al., urge that EPA is not exempted from the NEPA requirements. They stress the statutory language requiring ALL agencies to comply, and note that there is no specific language in either NEPA or FIFRA which exempts EPA in this or any other set of circumstances. They note two District Court cases which indicate that all agencies, even the environmental ones, are covered by the NEPA requirements.[45] Furthermore, they contrast the action of Congress in providing a specific exemption for EPA in the Federal Water Pollution Control Act Amendments of 1972,[46] with the absence of a provision in the 1972 FIFRA amendments enacted three days later.[47]

On the other hand, EPA contends that NEPA does not apply to the "environmentally protective regulatory activities of the Administrator conducted under the registration cancellation provision of the FIFRA."[48] Instead, EPA believes that the case is controlled by this Circuit's decision in Portland Cement Ass'n v. Ruckelshaus.[49] EPA limits its brief to the contention that NEPA does not apply to *this* type of action, although it states in footnote that perhaps NEPA is not applicable to any of EPA's environmentally protective regulatory activities.[50]

*Portland Cement* involved EPA's promulgation of stationary source standards for cement plants pursuant to the Clean Air Act.[51] The EPA action was challenged in part because the agency did not file a NEPA statement in conjunction with the promulgation of standards. Judge Leventhal noted that "there is a serious question whether NEPA is applicable to environmentally protective regulatory agencies. There is no express exemption in the language of the Act or Committee Reports."[52] We analyzed the pertinent legislative history, concluded that it was inconclusive, and then looked to the purpose and policies underlying NEPA. The goal of NEPA was of course to protect the environment, which it did through "a broad-

45. The two cases noted by Coahoma are Kalur v. Resor, 335 F.Supp. 1 (D.D.C.1971) [re Corps of Engineers], and Anaconda v. Ruckelshaus, 352 F.Supp. 697 (D.Colo.1972) [re EPA]. The first of these cases was dismissed as moot by this Circuit. *See* Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 318 n. 41, 486 F.2d 375, 385 n. 41 (1973). The second case was observed by us in *Portland Cement* to have a "myopic" view. *Ibid.*

46. 33 U.S.C. § 1371(c) (Supp. II, 1972).

47. The FIFRA amendments are contained in the Federal Environmental Pesticide Control Act of 1972, 7 U.S.C. § 136 (Supp. II, 1972). A similar argument was put forth in the *Portland Cement* case, but was dismissed

by the court there as providing a "hazardous basis for inferring the intent of the earlier Congress." 158 U.S.App.D.C. at 315, 486 F.2d at 382, citing to United States v. Southwestern Cable Co., 392 U.S. 157, 170, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968).

48. Supplemental *Brief* of Respondent Ruckelshaus, at 2.

49. 158 U.S.App.D.C. 308, 486 F.2d 375 (1973).

50. Supplemental Brief of Respondent, Ruckelshaus, at 2–3, n. 1. The EDF supports the limited stand of EPA. Supplemental Brief of Petitioner, EDF, at 13.

51. 42 U.S.C. § 1857c–6 (1970).

52. 158 U.S.App.D.C. at 314, 486 F.2d at 381.

ly applicable measure that only provides a first step." [53] In *Portland Cement* we thought that this goal might best be served by exempting certain activities from the formal requirements of filing NEPA reports. While we were not there willing to decide whether there was a broad exemption for all EPA environmental actions, we concluded that the actions taken in that case under the Clean Air Act were exempt from NEPA, because the Clean Air Act "requires the functional equivalent of a NEPA impact statement." [54] The Clean Air Act required the Administrator to supply a statement of reasons for his proposed standard, which statement should set forth the environmental considerations, both pro and con, and thus the Act seemed to "strike a workable balance between some of the advantages and disadvantages of full application of NEPA." [55] Furthermore, opportunity for public comment was provided, as was opportunity for court review.

█ The rationale we first developed in *Portland Cement* is applicable here as well, and an exemption from the strict letter of the NEPA requirements is thus appropriate. The explicit language in FIFRA requires that pesticides be deregistered if they will be injurious to man and his environment. The substantive standard established by the statute places great emphasis on the quality of man's environment. Additionally, the precedural standards provide full opportunity for thorough consideration of the environmental issues, and for ample judicial review. In this particular case, lengthy hearings were held, during which public comment was solicited, and a wide scope of environmental aspects were considered. Thus the functional equivalent of a NEPA investigation was provided, for all of the five core NEPA issues were carefully considered: the environmental impact of the action, possible adverse environmental effects, possible alternatives, the relationship between long- and short-term uses and goals, and any irreversible commitments of resources—all received attention during the hearings and decision-making process.[56] The law requires no more.

When it is clear that the NEPA objections are being raised by parties who have had ample opportunity to express their views,[57] when there has been functional compliance, the *Portland Cement* rationale should certainly apply, and the agency action should be exempted from the strict letter of NEPA requirements. As we wrote recently, "To require a 'statement,' in addition to a decision setting forth the same considerations would be a legalism carried to the extreme."[58]

Our recent decision in Arizona Public Service Co. v. FPC,[59] which requires an

---

53. *Id.* at 316, 486 F.2d at 383.

54. *Id.* at 317, 486 F.2d at 384.

55. *Id.* at 319, 486 F.2d at 386.

56. *See* note 44, *supra.*

57. As EPA points out, the NEPA objection was only first raised in the briefs to this court; in none of the earlier proceedings was any mention made of NEPA requirements. The raising of the objection so late in the proceedings makes the Coahoma position look more like a delaying tactic than a real concern with the environment. However, our recent decision in Arizona Public Service Co. v. FPC, 157 U.S.App.D.C. 272, 280, 483 F.2d 1275, 1283 (1973), noted that "the tardiness of the parties cannot excuse an agency from complying with its responsibilities under NEPA."

58. International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 446, 478 F.2d 615, 650 n. 130 (1973). The court in *International Harvester* noted that

the requirements of NEPA should be subject to a "construction of reasonableness." Although we do not reach the question whether EPA is automatically and completely exempt from NEPA, we see little need in requiring a NEPA statement from an agency whose raison d'être is the protection of the environment and whose decision on suspension is necessarily infused with the environmental considerations so pertinent to Congress in designing the statutory framework.

*Ibid.*

59. 157 U.S.App.D.C. 272, 483 F.2d 1275 (1973).

agency to at least file a statement of reasons as to why an impact statement is not necessary,[60] is inapposite to the case at bar. In *Arizona Public Service* the Federal Power Commission did not look carefully at the environmental questions, but merely concluded in one sentence that there was no environmental impact.[61] That is a far cry from the instant case, where the whole focus of the agency action has been on the environmental aspects of the use of DDT. The reason for the failure to file a formal NEPA impact statement need not be explicitly stated here, for it is apparent on the face of the agency's action.

 We conclude that where an agency is engaged primarily in an examination of environmental questions, where substantive and procedural standards ensure full and adequate consideration of environmental issues, then formal compliance with NEPA is not necessary, but functional compliance is sufficient. We are not formulating a broad exemption from NEPA for all environmental agencies or even for all environmentally protective regulatory actions of such agencies. Instead, we delineate a narrow exemption from the literal requirements for those actions which are undertaken pursuant to sufficient safeguards so that the purpose and policies behind NEPA will necessarily be fulfilled. The EPA action here meets this standard, and hence this challenge to the EPA action is rejected.

## IV.  CONCLUSION

On review of the decision and Order of the EPA Administrator, we find it to be supported by substantial evidence based on the record as a whole. Furthermore, we find that EPA has provided the functional equivalent of a formal NEPA report. Therefore, the two challenges raised concerning the Administrator's decision to cancel DDT registrations are rejected and the Administrator's action is affirmed.