STATE OF WYOMING et al.,
Plaintiffs-Appellees,

v.

Stanley K. HATHAWAY, Individually and as Secretary of the United States Department of Interior, et al., Defendants-Appellants,

and

Wyoming Stock Growers Association, Intervenor-Appellee.

No. 75–1491.

United States Court of Appeals, Tenth Circuit.

Oct. 28, 1975.

Rehearing Denied Nov. 24, 1975.

George S. Andrews, Cheyenne, Wyo., for appellee, State of Wyoming.

Houston G. Williams, of Wehrli & Williams, Casper, Wyo. (Frank D. Neville, of

Wehrli & Williams, Casper, Wyo., on the brief), for appellees except State of Wyoming.

John J. Zimmerman, Atty., Dept. of Justice (Wallace H. Johnson, Asst. Atty. Gen., and Edmund B. Clark, Raymond N. Zagone and Gerald S. Fish, Attys., Dept. of Justice, on the brief), for appellants.

Glenn Parker, Cheyenne, Wyo., for intervenor-appellee.

Before HILL, SETH and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This appeal seeks reversal of the judgment of the district court granting preliminary injunctive relief against the Administrator of the Environmental Protection Agency. The order enjoined the Administrator from taking any further action to enforce a certain numbered order, P.R. Notice 72–2 dated March 9, 1972, which suspended and cancelled the registration of three chemical toxicants, strychnine, sodium fluoroacetate (1080) and sodium cyanide, as economic poisons for use in predator control under the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 135 *et seq*. The predator which was the object of the poisoning program was the coyote.

The trial court found that the Administrator had failed to file a detailed Environmental Impact Statement prior to the issuance by him of the Pesticides Regulation (P.R.) Notice 72–2. The court said that the order constituted a major federal action significantly affecting the quality of the human environment in that it cancelled and suspended registration for certain poison products which we have mentioned. The court went on to say that since the order constituted major federal action, etc., the EPA was required under 42 U.S.C. § 4332 to file the detailed impact statement. The court further found that the Administrator had failed to take into account all possible approaches and alternatives and further found that the Administrator had not pursued a program which constituted a functional equivalent of furnishing a for-mal National Environmental Policy Act (NEPA) report and that consultations with the plaintiffs had not been had. Finally, the court concluded that as a consequence of the failure to file an environmental impact statement, the P.R. Notice 72–2 suspending and cancelling registration to the poisons was invalid and would remain invalid until such time as a valid impact statement had been filed by the Environmental Protection Agency.

This appeal does not call upon us to review the merits of the Environmental Protection Agency order. Thus we do not weigh the value of the poison program against the injury or damage that it produces. We are concerned rather with the legality of the proceedings and, particularly, whether the trial court was justified in entertaining an injunction suit notwithstanding that no effort had been made to pursue the remedies provided by law, including a review of the order of the Administrator by this court.

The specific issues which we here consider are:

1. Whether the Administrator of the Environmental Protection Agency is required to prepare a formal environmental impact statement prior to taking action suspending and cancelling a chemical toxicants registration under the Federal Insecticide, Fungicide and Rodenticide Act, *supra*.

2. Whether there has been a substantial compliance with the requirements of NEPA by the Administrator as a result of his having taken into account the so-called Cain Report, which was based on an objective and scientific study of the consequences of using the mentioned three poisons for predator control purposes and which measured the value to be derived from the use of the program as opposed to the injury to non-target animals.

A determination of the mentioned issues furnishes the answer to whether the trial court acted correctly in entertaining an injunction suit and in granting temporary relief.

■ The evidence presented to the Administrator of the Environmental Protection Agency established to his satisfaction that a hazard existed which demanded immediate suspension of the registration of the pesticides and which also demanded suspension and cancellation of the registration. The plaintiffs-appellees did not seek administrative review of this order of suspension in accordance with the requirements of 7 U.S.C. § 135b(c) within 30 days following the issuance of the order of the Administrator.[1]

The action of the Administrator of the Environmental Protection Agency was issued on March 9, 1972. 37 Fed.Reg. 5718 (March 18, 1972). In it Mr. Ruckelshaus, the then Administrator, stated that the previous spring the agency had made a public commitment to review the status of registrations for strychnine, cyanide and sodium fluoroacetate (1080) for use in prairie and rangeland areas for the purpose of predator and rodent control. The Administrator added: "This commitment grew out of grave concern surfaced by the reported deaths of some 20 eagles killed by the misuse of thablium sulfate." The Ruckelshaus opinion noted that the Secretary of the Interior was moved to also conduct a review of the government's federal predator control program.

The main thrust of the suspension and cancellation opinion was the existence of indiscriminate baiting which occurs over wide ranging areas of the prairie and the failure in carrying out this indiscriminate use to take any precautions for the protection of other animals, including endangered species. The mere toxicity was held not to be a basis for holding that the substance constituted a hazard, but "their degree of toxicity and pattern of use may well do so."[2]

The agency's statement of decision further noted that apart from its review and the Cain findings, a detailed petition had been submitted by several conservation groups urging the cancellation of the poisons in question. That petition invoked the provision of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), which requires that an economic poison contain directions for use which are "necessary and if complied with, adequate to prevent injury to living man and other vertebrate animals. . . .", 7 U.S.C. § 135(z)(2)(d), and it authorizes the Administrator to initiate cancellation proceedings by ordering suspension when he finds that such action is necessary to prevent hazard to the pub-

1. We recognize that this remedy is designed for parties who are directly affected by the suspension order, to-wit, the manufacturers or sellers. By the same token consumers, in this case sheep growers, are so remotely involved as not to be entitled to notice and hearing. They do nevertheless have a right to seek a review of the Environmental Protection Agency order in the United States Court of Appeals, this court. They failed to pursue this remedy.

2. * * * The unattended and unsupervised use of poisons over large areas of land, by definition, poses a hazard to non-target species. The fact that label instructions contain directions for placing the baits at times and in areas least likely to be populated by non-target species and for policing them, afford slight, if any comfort. This Agency has on prior occasions taken into account a "commonly recognized practice" of use (see In Re Hari Kari Lindane, I.F. & R. (Docket #6)), and has noted that the likelihood of directions being followed may affect their ade-

quacy (see In Re King Paint, 2 ERC 1819 (1970); In Re Stearns, 2 ERC 1364 (1970)).

The hazards from the pattern of use of these chemicals is not remote or off in the distant future. The prairies and ranges are populated by numerous animals, some of which are becoming rare. At jeopardy are potentially endangered species. Each death to that population is an irremediable loss and renders such species closer to extinction.

No apparent circumstances exist to counterbalance this distinct hazard and suggest that the possibility of irremediable loss is outweighed by the harm that must occur from their non-availability during a period of suspension. The situation might well be different were the removal of these poisons from the market likely to affect human health or the supply of a staple foodstuff; or were there no apparent alternatives available, the balance might be differently struck. This, however, is not true.

lic. Based upon the review of the registrations of strychnine, cyanide and sodium fluoroacetate (1080), and in light of the available evidence, Ruckelshaus concluded that the registrations for predator uses should be suspended and cancelled.

The Administrator relied to a very great extent on the Cain Report, a carefully researched and well written document prepared by a study committee. This report was issued by the Advisory Committee on Predator Control at the University of Michigan on October 30, 1971. The study had been authorized in April 1971. The Department of the Interior together with the Council on Environmental Quality sponsored this study by a panel of which Stanley A. Cain was chairman. The panel reviewed and analyzed predator control and associated animal control policies of the United States. It evaluated their direct and indirect effects, including environmental impact on the livestock industry and considered alternatives to the present practices. The report of the committee formed a basis for the order which is now under attack. Its thrust was that the predator control program employed the subject poisons; that these poisons were non-specific, and thereby posed hazards to threatened species.

The report also noted that the poison program, although governmental, primarily served the private industry of sheep growing. It recommended the use of truly specific poisons plus the use of repellents, reproductive inhibitors, live trapping and transplant procedures. Also supported was an extension system, whereby producers would be encouraged to solve their own problems by accepting methods directed toward specific animals. Still another recommendation of the study committee was the adoption of a federally based insurance program which would protect from all losses. The main emphasis of the report was the threat to endangered species from the widespread use of these poisons. Affected species singled out included the Bald and Golden Eagles, the California Condor, the Black-Footed Ferret, the moun-tain lion, the Grizzly Bear, Rocky Mountain Wolf and the Red Wolf.

The evidence at the trial consisted of testimony of one of the plaintiffs, a sheep rancher from Carbon County, Wyoming, a sheep and cattle rancher and the Acting Commissioner of Agriculture for Wyoming. These witnesses testified to lamb, sheep and cattle losses in Wyoming together with the levels of use of the three toxicants in question over the years 1965–74. Also introduced by the plaintiffs-appellees was the Cain Report together with the 1974 Predator Survey published by the Department of the Interior showing sheep loss figures for various years. Other evidence included deposition and exhibits which dealt with sheep loss figures.

If the Environmental Protection Agency was subject to the NEPA requirement that there be a study and the preparation of an impact statement prior to the issuance of the P.R. Notice 72–2, in other words is not immune from such preparation by reason of the fact that its function requires consideration of environmental factors, then the trial court would have had jurisdiction to halt the proceedings until such an impact statement had been issued unless it could be said that the Cain Report constituted the functional equivalent of an environmental impact statement.

It is our conclusion that in the present circumstances at least the Environmental Protection Agency was not compelled to follow out the procedures prescribed by NEPA including the preparation of an environmental impact statement; that it was error for the trial court to issue an injunction; that the appropriate remedy is review of the agency action in this court.

In reaching this conclusion we repeat that we do not consider the merits of this controversy. We merely hold that a formal environmental impact statement was not required and that the trial court lacked authority to issue the preliminary injunction.

## I.

## ADEQUACY OF THE HEARINGS

■ The trial court based its decision on the failure of the Environmental Protection Agency to prepare an environmental impact statement as such prior to its order of suspension and cancellation. In the opinion which accompanied the issuance of the temporary injunction, the court brought out that the Environmental Protection Agency had not provided any functional equivalent of a formal NEPA report and that the EPA order had been issued without input from or consultation with plaintiffs or their representatives; that in the absence of an adequate impact statement an injunction was proper.[3]

The Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 135 et seq., does provide for a hearing if the party interested wishes to request one. See 7 U.S.C. § 135b(c). The section cited allows the Administrator to suspend or cancel the registration of an economic poison whenever it does not appear that the article or its labeling complies with the provisions of § 135 et seq. of this Act. When there is a determination that an economic poison is to be cancelled, the applicant or registrant is notified of this fact, for he is the primary party in interest rather than the consumers, who are here parties to the lawsuit. The applicant is given 30 days after service of notice of the refusal to file a petition requesting that the matter be referred to the advisory committee or file objections and request a public hearing in accordance with the Act. A cancellation of registration is effective 30 days after service of the foregoing notice unless there is a demand for referral to an advisory committee or the filing of objections and request for a public hearing.

There was no compliance by the registrant here, or anyone else for that matter, with the procedural provisions of this statute. Instead two years were allowed to pass and then various users of these poisons sought to avoid these administrative procedures by filing an action in district court for injunctive relief.

In addition to the review procedure there are provisions for having an advisory committee appointed including a representative of the National Academy of Sciences.

There is in addition a provision for judicial review by the court of appeals. 7 U.S.C. § 135b provides that any person who is adversely affected by the order may obtain judicial review by filing with the United States Court of Appeals for the circuit wherein the person adversely affected resides or in the United States Court of Appeals for the District of Columbia Circuit. This review may be had within 60 days after the entry of the order. It goes on to provide that upon the filing of such petition, the court shall have exclusive jurisdiction to set aside the order complained of in whole or in part. The court of appeals is empowered to adduce additional evidence either before it or before the Administrator.

It cannot therefore be said that the interested parties were deprived of hearings at the administrative level or before this court. The fact is that they chose not to utilize these remedies provided by law and chose instead to seek injunctive relief, a remedy which was not available.

---

**3.** The decisions of our court together with the decisions of other Circuits have held that district court jurisdiction exists to enjoin the agencies *other than EPA* pending the preparation of a sufficient environmental impact statement. *E. g., The Scenic Rivers Association of Oklahoma v. Lynn*, 520 F.2d 240 (10th Cir. 1975); *Davis v. Morton*, 469 F.2d 593 (10th Cir. 1972); *National Helium Corporation v. Morton*, 455 F.2d 650 (10th Cir. 1971); *Harlem Valley Transportation Association v. Stafford*, 500 F. 2d 328 (2d Cir. 1975); *Swain v. Brinegar*, 517 F.2d 766 (7th Cir. 1975); *Conservation Council of North Carolina v. Froehlke*, 473 F.2d 664 (4th Cir. 1973); *Silva v. Romney*, 473 F.2d 287 (1st Cir. 1973).

## II.

### WHETHER THE EPA WAS REQUIRED TO FILE AN ENVIRONMENTAL IMPACT STATEMENT

We have considered previously both sides of the issue whether an environmental impact statement is essential procedure. Thus, in *National Helium Corporation v. Morton, supra, David v. Morton, supra,* and *The Scenic Rivers Association of Oklahoma v. Lynn, supra,* we adopted the position that where an environmental impact statement is required by law, and where it has not been filed prior to the taking of agency action, there is a jurisdictional void which justifies the use of injunction to preclude further proceedings until a sufficient environmental impact statement is prepared and filed. On the other hand, we have recognized that the filing requirement is not invariable.

In *Anaconda v. Ruckelshaus,* 482 F.2d 1301 (10th Cir. 1973), we considered this very issue, i. e., whether the EPA was subject to this NEPA requirement. We held in essence that inasmuch as the sole mission of EPA is that of improving the quality of the environment it would only serve to impede its efforts to compel it to stop what it is doing so as to file an impact statement. We observed that the contention of the plaintiff in that junction action was lacking in merit, substance and jurisdiction. We added that the legislative history which is set forth in *Portland Cement Association v. Ruckelshaus,* 158 U.S.App.D.C. 308, 486 F.2d 375 (1973) "clearly establishes that such a statement was not contemplated by Congress." 482 F.2d 1306.

A number of decisions from other courts of appeals hold to this view. *E. g., Environmental Defense Fund v. EPA (DDT Suspension II),* 160 U.S.App.D.C. 123, 489 F.2d 1247 (1973); *Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App. D.C. 308, 486 F.2d 375 (1973); *Buckeye Power, Inc. v. EPA,* 481 F.2d 162 (6th Cir. 1973); *Dusquesne Light Co. v. EPA,* 481 F.2d 1 (3d Cir. 1973); *Appalachian Power Co. v. EPA,* 477 F.2d 495 (4th Cir. 1973); *Getty Oil Co. (Eastern Operation) v. Ruckelshaus,* 467 F.2d 349 (3d Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973). Moreover, the Supreme Court in *United States v. Students Chal. Reg. Agcy. Pro. (SCRAP),* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), recognized that 42 U.S.C. § 4332 does not apply to all agencies of the Federal Government. *Cf. Portland Cement Ass'n v. Ruckelshaus, supra.* (In fact, no decision that we are aware of holds to the contrary.)

At the time that NEPA was passed the EPA had not been organized.[4] Furthermore, the substance of NEPA is such as to itself exempt EPA from the requirement of filing an impact statement. Its object is to develop in the other departments of the government a consciousness of environmental consequences. The impact statement is merely an implement devised by Congress to require government agencies to think about and weigh environmental factors before acting.[5] Considered in this light, an organization like EPA whose regulatory activities are necessarily concerned with environmental consequences need not stop in the middle of its proceedings in order to issue a separate and distinct

---

4. The EPA was created by Reorganization Plan No. 3, submitted to Congress on July 9, 1970 and became effective December 2, 1970. 35 Fed.Reg. 15623 (1970). *See* 42 U.S.C. § 4321 note.

5. *See, e. g., Zabel v. Tabb,* 430 F.2d 199, 211 (5th Cir. 1970): "This Act essentially states that every federal agency shall consider ecological factors when dealing with activities which may have an impact on man's environment."

The Act also enables agencies which claimed they had no statutory authority to consider environmental factors to include such considerations. *See, e. g.,Calvert Cliffs' Coordinating Committee v. Atomic Energy Comm'n,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1112 (1971): "Now, however, [the AEC's] hands are no longer tied. It is not only permitted, but compelled, *to take environmental values into* account."

impact statement just to be issuing it. To so require would decrease environmental protection activity rather than increase it. If EPA fails to give ample environmental consideration to its orders, its failure in this regard can be corrected when the order is judicially reviewed,[6] but collateral review such as was sought here was never contemplated and is not to be allowed. To allow the use of district court injunction would constitute usurpation of the function granted to this court as well as a repudiation of our prior decisions. The question whether the EPA is forever and under all circumstances exempt from filing an environmental impact statement is not here being decided. Under the circumstances presented, it was clearly unnecessary for such a statement to be filed.

### III.

### WAS THE ADMINISTRATOR'S ACTION EQUIVALENT TO AN ENVIRONMENTAL IMPACT STATEMENT?

The trial court thought that it was not an equivalent. We have to disagree. A study of 42 U.S.C. § 4332 shows that Congress was seeking to require the government agencies to think about, and consider, environmental considerations in making decisions. It was not intended to force the agency to merely follow out a regimen. There are enough of these without imposing another.

Sub-section (C) specifically provides that all agencies of the Federal Government shall

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

The Administrator's order, findings and conclusions substantially complied with the NEPA requirement.

The opinion, parts of which are quoted above, show that the problem was long considered to be a serious one. The Administrator had a good deal of information before him. Included was the Cain Report which itself was very similar in objectives and in content to an environmental impact statement.

As we said in *National Helium Corporation v. Morton, supra,* NEPA does not call for any particular framework or procedure and so long as the impact statement is relevant and thorough it need not be extensive.[7]

**6.** *See, e. g., Environmental Defense Fund v. EPA (Aldrin-Dieldrin II),* 510 F.2d 1292 (D.C. Cir.1975); *Environmental Defense Fund v. EPA (DDT Suspension II),* 160 U.S.App.D.C. 123, 489 F.2d 1247 (1973); *Environmental Defense Fund v. EPA (Aldrin-Dieldrin I),* 150 U.S. App.D.C. 348, 465 F.2d 528 (1972); *Environmental Defense Fund v. EPA,* 142 U.S.App. D.C. 74, 439 F.2d 584 (1971).

**7.** In the *Helium* case we said:

In oral arguments the appellees have expressed a desire for extensive administrative proceedings. We do not see any such re-

quirement. This is an intradepartmental matter in which the Secretary fulfills his obligation by following the mandate of the NEPA. Neither the APA nor the NEPA compels him to appoint an examiner and conduct hearings. Indeed, the Department has NEPA procedures in its manual. He ought to at least follow these. There is no indication that Congress in enacting the NEPA intended to impose extensive procedural impediments to Department action. 455 F.2d at 656–57.

The study and factual development which the Administrator pursued satisfied the standards of the Act of Congress. It was in our view a substantial equivalent to the statutory impact statement.

\*　　\*　　\*

The district court's judgment issuing a temporary injunction is reversed and the cause is remanded for further proceedings. Inasmuch as the amended complaint contains claims other than those which were here considered by the court, which claims have not been tried, we do not order the dismissal of the untried claims or the cause of action.

SETH, Circuit Judge (dissenting):

I must respectfully dissent from the majority opinion.

In looking at the statutory provisions in effect at the time the administrative action took place, it appears that only a "registrant" could then ask for a post-order hearing. Also the record indicates that the only registrant in Wyoming was an agency of the federal government, the Bureau of Sport Fisheries and Wildlife. Thus a failure to ask for a hearing cannot be charged to the State of Wyoming.

The Act then provided, as it does now, that one adversely affected by an order could seek judicial "review" of the order by filing a petition in the United States Court of Appeals seeking to have the order set aside. It is difficult to determine what the court could have reviewed at that time for the State of Wyoming since there was no hearing and no record. This appears to have been a completely illusory remedy and a failure to seek it cannot be charged against Wyoming.

Thus under these circumstances there was no real administrative remedy available. The record is clear that the State sought relief from appropriate federal agencies when it became apparent that some administrative action was needed for the government to carry out its statutory duties to control predators. No administrative relief came about from these efforts.

I must also disagree with the majority in its position that no impact statement was required of the EPA, and anyway an equivalent was in existence.

As to the requirement that an impact statement be filed, the National Environmental Policy Act (42 U.S.C. § 4332) states that "all agencies" shall prepare such a statement. There is no provision for any exceptions and no indication that any were contemplated. Thus the courts should not create an exception for any reason, and not on the basis of a presumed expertise. It would not seem necessary to belabor the point in view of the mandate of the statute. This instance is a good demonstration as to why such a statement should be required of "all." Practice has developed the opportunity to give all groups a chance to air their positions during the preparation of such statements. This appears to be one of the reasons why the statements were required. "All" agencies must consider all the directions in which the impact of their major federal action may be felt.

Was the Cain Committee Report the "equivalent" of an impact statement? The Report was a compilation of a variety of published opinions, "studies," and statistical data compiled from a variety of sources. It did not really purport to be anything more than a synthesis of the literature initially prepared for, or by various organized groups. It contains a clear caveat that the data was not from carefully designed research directed to pertinent questions. The Report then said of this: "It is impossible to know when one might go astray in drawing inferences from this type of information." The government now tries to read into the Report much more than the writers intended. It did not purport to be an objective analysis of this problem, but only of selected literature identified with proponents of a position on

the subject. The Committee refused to consider data sought to be submitted by Wyoming. This kind of a report cannot be considered as a "functional equivalent" of an impact statement, and it is not fair to the Committee to try to do so. The Committee did not purport to do more than it did. It was perfectly frank and academically straightforward in its decision that the urban position and wildlife dominance view should prevail. This would seem to be apparent from its statement that the sheep industry was a dying one, and it was of aesthetic importance for the urban population to see coyotes. This position is well expressed, and is a perfectly acceptable one.

Thus no one can quarrel with the Cain Report when it is taken for what it is, and what it is supposed to be, but it cannot be used for something it is not—a functional equivalent of an impact statement.

One final observation. The only basis for the EPA action was misbranding of the poisons after some fifty years of use with the only registrant in Wyoming being the Wildlife Service. This does not appear to be anything close to imminent danger for an "emergency" contemplated by any relevant Acts. After such a period of use of the poisons under the guidance of the Wildlife Service, and by it, in the discharge of its statutory duties, anyone contending for a contrary position certainly should have to bear the burden of proof to support a change.

I would affirm the trial court.