**ARIZONA PUBLIC SERVICE COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**The People of the State of California et al., Intervenors.**

**No. 72–1636.**

United States Court of Appeals, District of Columbia Circuit,

Argued April 25, 1973.

Decided July 30, 1973.

---

John T. Miller, Jr., Washington, D. C., for petitioner.

William M. Sawyer, Atty., F. P. C. with whom Leo E. Forquer, Gen. Counsel, George W. McHenry, Jr. Acting Sol., F. P. C., were on the brief, for respondent.

Lawrence Q. Garcia, with whom J. Calvin Simpson, San Francisco, Cal., was on the brief, for intervenors People of the State of California and the Public Utilities Commission of the State of California. Sheldon Rosenthal, San Francisco, Cal., also entered an appearance for intervenors State of California and the Public Utilities Commission for the State of California.

Frederick T. Searls, Malcolm H. Furbush and Daniel E. Gibson, San Francisco, Cal. were on the brief for intervenor Pacific Gas and Electric Co.

C. Hayden Ames and Donald J. Richardson, Jr., San Francisco, Cal., were on the brief for intervenor San Diego Gas and Electric Co.

Thomas F. Brosnan, Washington, D. C., entered an appearance for intervenor Tucson Gas and Electric Co.

Before WILBUR K. MILLER, Senior Circuit Judge, and TAMM and ROBB, Circuit Judges.

TAMM, Circuit Judge:

We are asked to review the Federal Power Commission's [Commission] denial of an application for a certificate of public convenience and necessity filed by El Paso Natural Gas Company [El Paso]. For reasons set forth below, we remand for further consideration of environmental issues.

I

For present purposes, the facts may be summarized briefly. El Paso is a natural gas company within the scope of the Natural Gas Act.[1] It is engaged in the business of producing, purchasing, transporting and selling natural gas for resale and direct consumption, and currently operates the only interstate gas pipeline serving the state of Arizona. Petitioner, Arizona Public Service Company [APS], is a combination gas and electric public utility serving various areas of the state of Arizona. APS purchases the entire supply of gas used in its distribution activities from El Paso in addition to large volumes of gas used directly for its electrical generating plants.

In anticipation of a predicted increase of nearly 75% in electrical load between 1970 and 1976, APS launched what may be described simply as a two-fold plan to enlarge its capacity. On the one hand it currently participates in and intends to participate in several large scale coal-fired plant projects, including those at Four Corners and Page, Arizona. On the other hand, on a smaller scale, in order to provide for incremental increases in capacity, system reliability (particularly during times of peak demand), and to permanently supplement · the larger coal-fired units, APS plans to install ten gas turbine units with a capacity totaling approximately 450 Mw.[2] These units would be designed to burn oil as well as natural gas, and here lies the heart of the controversy.

At roughly the same time that APS was formulating plans to meet the predicted increase in demand for its services, El Paso was facing a shortage of natural gas available for the interstate market. Accordingly, it advised all customers in its Southern Division System, including APS, that it could not provide significant gas supplies over and above current contract commitments. Similarly, in the recent past, even supplies purchased by those customers under direct sales contracts had occasionally been curtailed. It was with this problem in mind that APS designed its gas turbine units to burn oil as an alternative fuel.

Not yet ready to throw in the towel, however, APS initiated a search for natural gas in Texas, independent of El Paso. The search was fruitful, culminating in an eight year contract with Forest Oil Corporation [Forest] for 50,000,000 Mcf. of natural gas from the Delaware Basin at a rate substantially above that set by the Commission for sales for resale. Since the gas was purchased by APS for direct use in its generators, the transaction was not subject to Commission jurisdiction.[3] Unable to

---

1. 15 U.S.C. § 717 et seq. (1970).

2. The gas turbine units would ultimately provide about one-fifth of APS's anticipated 1976 demand of approximately 2200 Mw. See J. A. at 58.

3. A jurisdictional question was raised before the Commission due to the somewhat

unusual nature of the sales transaction. The natural gas in question had been sold by Forest to a third party in Texas in an intrastate transaction. In an attempt to avoid any possibility that the APS transaction would be considered a "sale for resale" within the meaning of the Natural Gas Act, simultaneously with its contract

move the gas from Texas to facilities in Arizona, APS then contracted with El Paso to construct additional facilities and transport the gas, a proposal which required approval by the Commission.[4] Accordingly, on March 29, 1971, El Paso filed an application for a certificate of public convenience and necessity under Section 7 of the Natural Gas Act[5] which would authorize it to transport up to 32,000 Mcf. of natural gas per day for APS from the Delaware Basin of West Texas to Arizona and to construct associated facilities, including more than 17 miles of additional pipeline. Several months later a hearing was held and on September 7, 1971, the presiding examiner issued his initial decision denying El Paso's application.[6] On March 22, 1972, the Commission affirmed.[7]

## II

Many of the issues typically critical to similar applications were not involved in the present controversy. The parties stipulated:

That the proposal set forth in El Paso's said application does not raise issues respecting the reserves to be transported for APS; the ability of the proposed facilities to transport such reserves in the manner proposed; the cost of the facilities; the ability of El Paso to finance the proposed facilities; economic feasibility; or the ability of APS to utilize such reserves.[8]

The presiding examiner properly went on to consider several other factors involving the public interest, see FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961), namely the effect of the purchase on available supply, the end use to which the gas would be put, the preemption of pipeline space that would be involved, the availability of alternative fuel to APS, and the adverse environmental effects that would result from using an alternative fuel such as oil.

The first and dominant factor injected into the balancing process was the price to be paid for the Texas gas, substantially above the field rates set by the

---

with Forest APS also contracted with the third party to release the gas. The jurisdictional issue was resolved by the Commission, has not been raised on appeal, and, in any case, is not pertinent to the issues at hand.

Referring again to the relevant contracts, Intervenors Pacific Gas and Electric Company and San Diego Gas & Electric Company argue that there is no viable issue before this court. They base their argument on the contract between APS and Forest, which provided that the supplier had certain rights to terminate the agreement, essentially depending upon whether the proposal was implemented as agreed after Commission perusal. Since the gas supply contracts which supported the pipeline failed, the issue concerning the pipeline application must also fail, they reason. This ignores the fact that the contract between APS and El Paso, involving substantial consideration, apparently remains obligatory, as well as the argument by petitioner "that upon remand of this case [APS] will be able to negotiate new gas supply agreements to replace the ones which expired. But so

long as the Commission's order remains a valid precedent, such efforts to obtain a supplementary gas supply remain fruitless." Reply Brief for Petitioner at 2. In further support of this contention there is record evidence that APS was actively involved in negotiating new supply contracts while the application was pending. See El Paso Natural Gas Co., 47 F.P.C. 896, 914–15 (1972) (Initial Decision of the Presiding Examiner). We therefore do not think the present case is moot. Cf. So. Pac. Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911).

4. Natural Gas Act § 1, 15 U.S.C. § 717 (1970).

5. 15 U.S.C. § 717f (1970).

6. El Paso Natural Gas Co., 47 F.P.C. 896, 901 (1972) (Initial Decision of the Presiding Examiner).

7. El Paso Natural Gas Co., 47 F.P.C. 896 (1972).

8. Id. at 903 (Initial Decision of the Presiding Examiner). See Natural Gas Act § 7(e), 15 U.S.C. § 717f(e) (1970).

Commission,[9] and the effect that it might have upon supply. The Commission [10] reasoned that "approval of the application would result in an incentive for producers to hold their gas off the interstate market [where the lower rates fixed by the Commission prevail] with the objective of packaging it for sale at higher prices." [11] The result would be adverse both in terms of the price and the amount of gas available for the interstate market. More specifically, large users with substantial financial resources such as APS would presumably be able to "tie up ever-dwindling gas reserves in the field" [12] to the detriment of small consumers and regulated pipelines. On the other hand, if the Commission refused this and similar applications and presumably dealt with the problem comprehensively, it would successfully induce into the interstate market much of the natural gas now devoted to the non-jurisdictional intrastate market.

The Commission next examined the closely related issues of pre-emption and end use. Admittedly utilization of natural gas as boiler fuel is an "inferior" end use. A frequent corollary is that pipeline facilities tied up for such purposes are thereby pre-empted from being used to transport gas for "superior" uses. The Commission concluded that the failure of any opponent to compare APS's asserted need for gas to be used for electrical generation with the local need for "superior" uses by residential, commercial and industrial customers meant that "we are left only with the general proposition" and therefore the demerit against APS on this score "cannot be said to be more than slight." [13] Notably, however, it was still a demerit.

Finally, after carefully considering the argument by APS that it had no

---

9. The raw figures associated with the proposal, viewed absolutely, are quite substantial. APS was to pay a total of approximately 51¢ per Mcf. of natural gas when all outlays are considered. This broke down to payments of approximately $14,000,000 for acquisition of the gas and an additional $10,000,000 for transportation. Expenditures by El Paso necessary to prepare for the increased load were to be in excess of $5,500,000.

Relatively speaking, the rates were also quite high. The unit price to be paid by APS to the supplier was approximately 29¢ per Mcf. This considerably exceeded the area price in the Permian Basin area of 16.5¢ per Mcf. As the presiding examiner reasoned:

[S]ince the recent history of approved increases in area rates makes the use of the 16.5 cents rate as a standard completely unrealistic and impractical, the ultimate question here is much closer. Nevertheless, even assuming an increase in the Permian Basin area rate to the same level (26 cents per Mcf) recently approved by the Commission in the Southern Louisiana Area, the result must be the same . . . . .

El Paso Natural Gas Co., 47 F.P.C. 896, 923 (1972) (Initial Decision of the Trial Examiner) (footnote omitted). He accurately observed that even the disparity of approximately 3¢ was double that in two recent cases where part of the winning rationale was the detrimental effect of the higher price on supply. See FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961) and Transwestern Pipeline Co., 36 F.P.C. 176 (1966), affirmed sub nom. Southern California Edison Co. v. FPC, 387 F.2d 619 (3d Cir. 1967), cert. denied, 392 U.S. 909, 88 S.Ct. 2055, 20 L.Ed.2d 1367 (1968).

10. Since, regarding the issues raised on this appeal, the Commission adopted the findings of the presiding examiner, adding merely a few explanatory notes, the opinions of the examiner and the Commission will be referred to collectively as the Commission. Similarly, we have also considered and dispose of, in the context of this opinion, the issues purportedly raised by the Commission's denial of rehearing. See Opinion 615–A, 47 F.P.C. —— (May 18, 1972).

11. El Paso Natural Gas Co., 47 F.P.C. 896, 899 (1972).

12. Id.

13. Id. at 924.

readily available oil reserves and therefore, being landlocked, was subject to the uncertainties inherent in shipment of oil by rail or truck, the Commission found that APS had never in the past been plagued by untimely delivery of oil for use in its boilers. Indeed, it further found that APS had effectively conceded that sufficient supplies of oil could be contracted for, albeit oil with high sulphur content. "[A] fair reading of the record compels a finding that fuel oil is available to APS as an alternative fuel. . . . [N]o plus mark can be said to accrue to the proposal by virtue of the unavailability of an alternative fuel." [14] At this juncture, fully aware of the limited scope of our review,[15] we find no fault with either the conclusions of the Commission or the process applied to juxtapose them. It is the final consideration, the environmental consequences of the proposed agency action, which compels a remand.

### III

██ The essence of the Commission's evaluation of environmental consequences is neatly summarized in the following statement by the presiding examiner:

[I]n terms of El Paso's required showing under the National Environ-

mental Policy Act of 1969, it is clear that no adverse environmental impact would be occasioned by any phase of the proposal. Actually, it is the other side of the coin—the consequences of *not* granting the proposal—which is of the greater import here. In brief, the proposal is entitled to a plus mark on this aspect of the proceeding—but one no greater than would be awarded *any* proposal involving the substitution of gas for oil as boiler fuel.[16]

The examiner went on to reason that if APS were permitted to utilize 50,000,000 Mcf. of natural gas over the eight year period in lieu of the purported 6,000,000 barrels of high sulphur content oil (more than triple APS's total predicted consumption of oil were the application to be granted), "at some point in time some other community (with 'rights', it must be said, equal to those of the Phoenix community) will be required to burn the same quantity of oil with whatever harmful effects flow therefrom." [17] Without questioning these conclusions, we are at a loss to test their validity. We can find no indication that an environmental impact statement within the meaning of § 102(2)(C) of the National Environmental Policy Act of 1969 [NEPA] [18] was filed. Indeed, every indication is that one was not filed.[19] On

14. *Id.* at 926.

15. *See, e. g.*, Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

16. El Paso Natural Gas Co., 47 F.P.C. 896, 926–27 (1972).

17. *Id.* at 927. This logic is not entirely dissimilar to that referred to recently by Senator Philip A. Hart when addressing the apparent problem of a natural gas shortage:

This shortage—or unavailability of natural gas—may be the keystone of the energy crisis. Lack of natural gas caused many users to switch to fuel oil —causing the "fuel oil crisis". The "fuel oil crisis", in turn, is blamed for the current "gasoline crisis". This is explained as the result of the refineries working at producing fuel oil well into the months they would have been turn-

ing out gasoline for the anticipated high summer demand.

It's a little bit like how for the want of a nail a kingdom fell—of nursery schooldays.

1973 CCH Trade Regulation Reporter No. 78 (Reports, June 25, 1973).

18. 42 U.S.C.A. § 4332(2)(C) (Supp.1973).

19. The only reference to an impact statement occurs in the Brief for Respondent at 24, n. 14:

Neither the Petitioner nor the Commission considers the actual construction of the pipeline to be the proper focus of the environmental concern. However, El Paso did submit the correct environmental impact statement as required by Section 102(2)(C) of NEPA and the Commission's own regulations in effect at the time of the application.

the other hand, no reason was given as to why the statement was not required nor is one apparent.[20] Even were we to concede the accuracy of the unsupported one sentence conclusion of the examiner, that no adverse environmental impact would result from the construction of 17 miles of additional pipeline and associated facilities, clearly he was correct in observing that the matter of great import was the *failure* to grant the application and the resulting consumption of millions of barrels of oil. In short, with one stroke of the pen the Commission arrived at the very conclusions which concerned those enacting NEPA. Without either meeting the procedural requisites of NEPA or providing us with record evidence of the substance from which conclusions were intended to be drawn, the Commission asks us to hold that it has not abused its discretion.

 APS argued vociferously in its brief that the Commission had failed to properly consider environmental factors:

The National Environmental Policy Act (NEPA) was intended to require a more sensitive reaction from the Commission than it has evidenced in this case. . . . An agency of the Federal Government must comply with the directives set out in Section 102(2) of NEPA . . . .[21]

Section 102(2) of NEPA requires, *inter alia*, that:

all agencies of the Federal Government shall—

. . . . . .

(C) include in every recommendation or report on proposals for legislation *and other major Federal actions significantly affecting the quality of the human environment,* a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the pro-

---

20. If the passage quoted in note 19 *supra* contains the reason for the Commission's failure to prepare an impact statement, it is clearly erroneous. The papers filed by a party concerning environmental effect, whatever else they may be called, are not "a detailed statement by the responsible official" within the meaning of NEPA § 102(2)(C). That issue was resolved, in the context of the very FPC regulations to which respondent refers, in Green County Planning Board v. FPC, 455 F.2d 412 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). The Commission has clearly recognized this, as evidenced by its adoption of new regulations which provide, *inter alia:*

The staff shall make an initial review of the applicant's report and, if necessary, require applicant to correct deficiencies in the report. If the proposed action is determined to be a major Fed-

eral action significantly affecting the quality of the human environment, *the staff shall conduct a detailed independent analysis of the action and prepare a draft environmental impact statement* . . . .

37 Fed.Reg. 28413 (December 23, 1972), amending 18 C.F.R. § 2.82(b) (emphasis added). Similarly, in later promulgating guidelines to assist applicants in preparing these exhibits, the FPC shed further light on their limited purpose:

These guidelines:

Identify information to be supplied by applicants *to assist the Federal Power Commission staff in an independent assessment* of major Federal actions significantly affecting the quality of the human environment. . . .

38 Fed.Reg. 6402 (March 9, 1973).

21. Brief for Petitioner at 24–25 (footnotes omitted).

posed action should it be implemented.

Even were we to accept respondent's argument that "[p]etitioner does not deny that the Commission did consider the appropriate environmental factors, nor does it question the procedures used in making the consideration," an unlikely conclusion in light of petitioner's argument as set forth above, it would be to no avail. NEPA makes environmental protection part of the mandate of every federal agency, and each is "not only permitted, but compelled, to take environmental values into account." Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1112 (1971).[22] The agency may not be permitted to skirt this responsibility, particularly where it may be in the interests of the parties for purposes of expedition or otherwise to overlook these considerations.[23] The minimum requirement for compliance with the "action—forcing" provisions of NEPA is for the agency to supply a statement of reasons why it believes that an impact statement is unnecessary. *See* Scientists' Institute for Public Information, Inc. v. AEC, 481 F.2d 1079, 1094–1095 (D.C.Cir. 1973), and Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

A statement of reasons will serve two functions. It will ensure that the agency has given adequate consideration to the problem and that it understood the statutory standard. In addition, it will provide a focal point for judicial review of the agency's decision, giving the court the benefit of the agency's expertise.

Scientists' Institute for Public Information, Inc. v. AEC, *supra*, 481 F.2d at 1095.

▮ Our position today and the remedy we adopt are not without recent precedent. In City of New York v. United States, 337 F.Supp. 150 (E.D.N.

---

22. We went on to state:
 Section 102 of NEPA mandates a particular sort of careful and informed decisionmaking process and creates judicially enforceable duties. The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values. But if the decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse. As one District Court has said of Section 102 requirements: "It is hard to imagine a clearer or stronger mandate to the Courts."
 449 F.2d at 1115 (footnote omitted).

23. *See also* Greene County Planning Board v. FPC, 455 F.2d 412, 419 (2d Cir. 1972), where the court stated, with reference to its earlier pre-NEPA decision in Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608 (2d Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966):

We commented there: "In this case, as in many others, the Commission has claimed to be the representative of the public interest. This role does not permit it to act as an umpire blandly calling balls and strikes for adversaries appearing before it; the right of the public must receive active and affirmative protection at the hands of the Commission." . . . But NEPA, which was a response to the urgent need for a similar approach in all federal agencies, went far beyond the requirement that the agency merely consider environmental factors and include those factors in the record subject to review by the courts. (Footnote omitted.)

Later, referring to the action-forcing provisions of NEPA § 102(2), the Court stated:

We view this section as did the District of Columbia Circuit. It is a mandate to consider environmental values "at every distinctive and comprehensive stage of the [agency's] process." The primary and nondelegable responsibility for fulfilling that function lies with the Commission.

*Id.* at 420.

Y.1972), Judge Friendly wrote for a unanimous three judge district court in resolving a similar problem. An action was brought to annul an order of the Interstate Commerce Commission [ICC] which authorized abandonment of a railroad line, consisting of approximately 15 miles of track and used predominantly to service New York harbor, on the ground that the ICC had failed to comply with NEPA. Despite the fact that the issue of applicability of an impact statement was not raised before the hearing examiner, and despite the railroad's convincing argument that it could not economically continue to run the line in question, the court agreed with plaintiff, first noting that the tardiness of the parties cannot excuse an agency from complying with its responsibilities under NEPA, then stating:

> To permit an agency to ignore its duties under NEPA with impunity because we have serious doubts that its ultimate decision will be affected by compliance would subvert the very purpose of the Act and encourage further administrative laxity in this area.

*Id.* at 160. The agency "action" involved was negative, like the present case, in the sense that it resulted not in the construction of new facilities but in the exact opposite.[24] Moreover, the potentially adverse environmental impact related not to the immediate physical features of the project—*i. e.* the absence of locomotives and personnel from the area or the physical removal of tracks—but to damage "once removed" yet directly attributable to the action—*i. e.* pollution caused by heavy truck traffic which would replace the railroad. The court remanded to the agency for further consideration of the environmental issue within the framework of NEPA. The agency's initial order was not vacated and the court retained jurisdiction. We opt for the same remedy, and give the Commission ninety days to conduct whatever further proceedings it deems necessary either for the preparation and circulation of an impact statement or for preparation of a statement of reasons as to why an impact statement is unnecessary. The parties shall serve and file any further briefs within twenty days thereafter.

. So ordered.

24. Even ignoring the fact that the environmental impact of denying the application here was greater than the impact of granting it, it is difficult to imagine how the specific procedural mandates of NEPA § 102(2)(C), such as the requirement that the detailed statement accompany the proposal through the existing agency review process and that the agency consider alternatives, could be accomplished if an agency could first arrive at a conclusion on the merits, and if that conclusion was negative, bootstrap itself into the position that an impact statement (or a statement of reasons why one was not required) thus became irrelevant. *See* Harlem Valley v. Stafford, 360 F.Supp. 1057 (S.D.N.Y.1973); C.E.Q., Third Annual Report 246 (August, 1972); C.E.Q., NEPA Guidelines § 10(b) & (e), 36 Fed.Reg. 7724, 7726 (1971); 38 Fed.Reg. 1696, 1697–99 (1973), amending 40 C.F.R. §§ 6.12, 6.20 & 6.25. *Cf.* Zabel v. Tabb, 430 F.2d 199 (5th Cir. 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971). In this respect, the Commission's own recently promulgated regulations are enlightening. As originally proposed, the regulations required a full evaluation of environmental impact only when applications were contested and only when the ultimate decision of the presiding examiner was to grant the application. *See* 37 Fed.Reg. 23363 (November 2, 1972). After receiving comments on the proposal, the Commission concluded:

> One point raised was that the Commission should evaluate the environmental evidence in its final order on the merits whether or not it approves the application. This point is well-taken.

37 Fed.Reg. 28414 (December 23, 1972). The regulations were modified accordingly. *Id.* at 28416.