AMERICAN PUBLIC GAS ASSOCIA-
TION and Consumers Federation of
America, Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Shell Oil Company, Exxon Corporation,
Pennzoil Company, Cotton Petroleum
Corporation, The Rodman Corporation,
Tenneco Oil Company, Gulf Oil Corpora-
tion, Getty Oil Company, General Ameri-
can Oil Company of Texas, Union Oil
Company of California, Mobil Oil Corpo-
ration, Kerr-McGee Corporation, Ash-
land Oil, Inc., The California Company,
etc., Continental Oil Company, Sohio Pe-
troleum Company, Amerada Hess Corpo-
ration, Skelly Oil Company, E. I. du Pont
De NeMours & Company, Inc., Atlanta
Richfield Company, Superior Oil Compa-
ny, Aminoil USA, Inc., et al., Inexco Oil
Company, Texas Production Company et
al., Phillips Petroleum Company, Owens-
Illinois Inc., General Motors Corpora-
tion, Celanese Corporation et al., Texa-
co, Inc., Cities Service Oil Company,
State of Louisiana, American Textile
Manufacturers Institute, Inc., Firestone
Tire & Rubber Company et al. and
Chemplex Company et al., Intervenors.

No. 75–2105.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 9, 1977.

Decided May 10, 1978.

On Motion to Deny Bill of Costs
Aug. 9, 1978.

Charles F. Wheatley, Jr., Washington, D.C., with whom William T. Miller, Stanley W. Balis and James L. Feldesman, Washington, D.C., were on the brief, for petitioners.

Scott M. DuBoff, Atty., Federal Energy Regulatory Commission, Washington, D.C., with whom Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, and Alan Abbott Tuttle, Sol., Federal Energy Regulatory Commission, Washington, D.C., were on the brief, for respondent.

Paul W. Wright, Houston, Tex., with whom Martin N. Erck and Lauren L. Eaton, Houston, Tex., were on the brief, for intervenor Exxon Corp. also argued for supporting producer intervenors. Edmunds Travis, Jr., Houston, Tex., also entered an appearance for intervenor, Exxon Corp.

Harry E. Barsh, Jr., Lake Charles, La., James R. Patton, Jr., David B. Robinson and Linda Elizabeth Buck, Washington, D.C., were on the brief, for intervenor, The State of Louisiana.

Edward J. Grenier, Jr., Richard P. Noland, Robert R. Morrow, Washington, D.C., Frazer F. Hilder and Julius Jay Hollis, Detroit, Mich., were on the brief, for intervenor, General Motors Corp. Richard J. Pierce, Jr., Washington, D.C., also entered an appearance for intervenor, General Motors Corp.

Gordon Gooch, Washington, D.C., was on the brief for intervenors, Petrochemical Energy Group (E. I. Du Pont De NeMours and Co., Inc., Celanese Corp., et al., Firestone Tire & Rubber Co., et al., Chemplex Co. and Petro-Tex Chemical Corp.), and entered appearance for intervenors, Pennzoil Co., Cotton Petroleum Corp., The Rodman Corp. and Tenneco Oil Co.

Bruce F. Kiely, Washington, D.C., was on the brief for intervenors, Petrochemical Energy Group (E. I. Du Pont De NeMours and Co., Inc., Celanese Corp., et al., Firestone Tire & Rubber Co., et al., Chemplex Co. and Petro-Tex Chemical Corp.), Pennzoil Co., and entered appearance for intervenors, Cotton Petroleum Corp., The Rodman Corp. and Tenneco Oil Co.

Ronald D. Eastman and Jeffrey D. Komarow, Washington, D.C., were on the brief, for intervenor, American Textile Manufacturers Institute, Inc.

David G. Stevenson, Tulsa, Okl., was on the brief for intervenor, Amerada Hess Corp.

David M. Whitney, Houston, Tex., was on the brief, for intervenors, Aminoil USA, Inc., et al.

Richard F. Generelly, Washington, D.C., was on the brief for intervenors, Ashland Oil, Inc. and General American Oil Co. of Texas. Robert G. Simon, Washington, D.C.,

also entered an appearance for intervenors, General American Oil Co. of Texas and Ashland Oil, Inc.

Edward J. Kremer, Lansing, Mich., was on the brief for intervenor, Atlantic Richfield Co.

Justin R. Wolf and Charles H. Shoneman, Washington, D.C., were on the brief for intervenor, The California Co., A Division of Chevron Oil Co.

Samuel H. Riggs, Jr. and Robert S. Wheeler, Tulsa, Okl., were on the brief, for intervenor, Cities Service Oil Co.

W. Neal Powers, Jr., Houston, Tex., was on the brief for intervenors, Texas Production Co., et al., and also entered an appearance for intervenor, Inexco Oil Co.

Tom Burton, Houston, Tex., was on the brief for intervenor, Continental Oil Co.

Cloy D. Monzingo and Jack L. Brandon, Houston, Tex., were on the brief, for intervenor, Getty Oil Co.

B. James McGraw and A. Randall Friday, Houston, Tex., were on the brief for intervenor, Gulf Oil Corp.

Arthur S. Berner, New York City, was on the brief for intervenor, Inexco Oil Co.

Derrill Cody and Patricia D. Robinson, Oklahoma City, Okl., were on the brief for intervenor, Kerr-McGee Corp.

Tom P. Hamill and Robert D. Haworth, Houston, Tex., were on the brief for intervenor, Mobil Oil Corp. Carroll L. Gilliam, Philip R. Ehrenkranz and Craig W. Hulvey, Washington, D.C., also entered appearances for intervenor, Mobil Oil Corp.

Charles M. Darling IV, Washington, D.C., entered appearance for intervenors, Pennzoil Co., Cotton Petroleum Corp., The Rodman Corp. and Tenneco Oil Co.

Perry O. Barber, Jr., Houston, Tex., entered appearance for intervenors, Pennzoil Co. and Tenneco Oil Co.

John L. Williford, Bartlesville, Okl., was on the brief for intervenor, Phillips Petroleum Co.

Thomas G. Johnson, Houston, Tex., was on the brief for intervenor, Shell Oil Co.

William G. Riddoch, Houston, Tex., also entered an appearance for intervenor, Shell Oil Co.

Ronald J. Jacobs, David C. Henri and Ronald E. Jarrett, Tulsa, Okl., were on the brief for intervenor, Skelly Oil Co.

Richard F. Remmers, Oklahoma City, Okl., was on the brief for intervenor, Sohio Petroleum Co.

W. B. Wagner, Jr., Pat F. Timmons and James M. Dunnam, Houston, Tex., were on the brief, for intervenor, The Superior Oil Co. Alexander E. Bennett, Washington, D.C., and David Bonderman, Houston, Tex., also entered appearances for intervenor, Superior Oil Co.

Michael B. Silva and Phyllis Rainey, Houston, Tex., were on the brief for intervenor, Tenneco Oil Co.

Roger L. Brandt, Houston, Tex., was on the brief, for intervenor, Texaco, Inc. Kirk W. Weinert, Houston, Tex., also entered an appearance for intervenor, Texaco, Inc.

Kenneth L. Riedman, Jr., Los Angeles, Cal., and Richard F. Wornson, Houston, Tex., were on the brief for intervenor, Union Oil Co. of California.

Jeron Stevens, Houston, Tex., was on brief for intervenor, Tenneco Oil Co., and also entered appearance for intervenors, Cotton Petroleum Corp., The Rodman Corp. and Tenneco Oil Co.

Keith R. McCrea, Washington, D.C., entered an appearance for intervenor, Owens-Illinois, Inc.

Before BAZELON, LEVENTHAL and ROBINSON, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

In this case we are called upon to review an order of the Federal Power Commission announcing a policy permitting interstate transportation of natural gas purchased in direct sale transactions between producers and high-priority consumers. The order under review, Order No. 533, FPC Docket No. RM75–25, reflects the Commission's efforts

to deal with undesirable dislocations in the distribution pattern of natural gas throughout the nation that have resulted from the severe shortage of natural gas coupled with the incomplete regulation of sales in the natural gas market. We find the challenged order to be a legitimate attempt by the Commission to devise techniques for promoting more nearly optimal gas distribution within the framework of our regulatory system.

## I. BACKGROUND

On April 4, 1975, the Commission issued a notice of proposed rulemaking in Docket No. RM75–25. The notice announced a proposed statement of policy to accept applications from jurisdictional pipelines for certificates to transport gas sold directly to non-resale high priority industrial or commercial customers, or to local distributors for resale to high priority customers; and to grant certificates when, upon consideration of all relevant factors, the Commission concluded that the public convenience and necessity standard had been satisfied.[1] In support of its proposed policy, the Commission noted that, due to increasing natural gas supply deficiencies, high priority users were experiencing curtailment despite the fact that they were accorded high priority status under end-use curtailment plans filed by numerous pipelines. Such curtailment, the Commission feared, would lead to a decrease in the production of essential products and services, with attendant inflation and increased unemployment.

The proposed policy was designed to remedy this situation by making available to high priority customers in the interstate market gas that would otherwise be sold only to intrastate consumers. The key to the Commission's plan lies in the gap in its jurisdiction, requiring a resort to price increase, rather than equitable allocation controls, in order to enable high priority customers to compete for gas supplies with the producer's intrastate purchasers (including low-priority purchasers).

The Commission stated that its proposed policy statement was not intended to alter any existing rule or regulation, but merely to make clear its views so as to encourage high priority customers, or local distributors who resell to high priority customers, to explore the possibility of entering into sales contracts with producers.[2]

Comments on the proposed order were submitted by various interests, including petitioners in the case at bar, American Public Gas Association and the Consumer Federation of America (hereafter referred to jointly as APGA). APGA opposed the

---

1. Under the proposed policy statement, the Commission favored approval of the transportation by jurisdictional pipelines of natural gas sold by producers of natural gas from the on-shore and the off-shore non-federal domain (1) directly to non-resale industrial and commercial customers for Priority 2 uses (large commercial requirements, firm industrial requirements for plant protection, feedstock and process needs, and pipeline customer storage injection requirements) or for those Priority 3 uses (other industrial requirements) that would have been in Priority 2 had the gas been purchased on a firm basis; or (2) to local distributors for resale to industrial or commercial customers for the same Priority 2 or 3 uses, or for resale to Priority 1 users (residential and small commercial). J.A. 11–12. The above priorities refer to the priorities as set forth in Section 2.78(a) of the Commission's General Policy and Interpretations, 18 C.F.R. § 2.78(a).

2. Earlier actions by the Commission might be viewed as reflecting the Commission's disfavor of applications for certificates of public convenience and necessity filed by jurisdictional pipelines for authority to transport gas purchased in direct sales. *See Transcontinental Gas Pipe Line Corp.*, 21 F.P.C. 138 (1959), *aff'd sub nom. F. P. C. v. Transcontinental Gas Pipe Line Corporation*, 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961); *El Paso Natural Gas Co.*, 47 F.P.C. 896 (1972), *aff'd sub nom., Arizona Public Service Company v. F. P. C.*, 157 U.S. App.D.C. 272, 483 F.2d 1275 (1973) and 160 U.S.App.D.C. 215, 490 F.2d 783 (1974). In the notice of proposed rulemaking resulting in the order now before us, the Commission sought to distinguish those cases on the grounds that they involved inferior use (as boiler fuel), possible preemption of pipeline capacity that would otherwise have been available for high priority uses, and a possible impact on field prices for jurisdictional sales or on the amount of gas available for high priority customers in the interstate market. J.A. at 8.

proposed policy on the grounds that it would violate the Natural Gas Act by permitting unregulated prices for sales that are required to be regulated; would unfairly favor the very largest industrial consumers, who can afford to purchase gas directly from a producer at unregulated, intrastate prices; and would operate to establish a new competitor for onshore gas, unrestrained as to the price it can pay, thus handicapping all interstate pipelines in their attempts to procure supplies of onshore gas. APGA proposed, as an alternative means of dealing with the gas shortage in the interstate market, that the Commission impose controls on intrastate rates, or allocate all gas supplies nationwide—options which, in APGA's view, were available to the Commission when necessary to protect interstate customers. J.A. 14–31.

After consideration of the comments submitted, the Commission determined to adhere to its proposed policy. In its order announcing adoption of the policy statement, it responded to APGA's concerns by asserting that the issues there raised could be decided only on a case-by-case basis, in light of the particular facts obtaining where parties sought to implement the policy statement. Order No. 533, J.A. 32–79. APGA's application for rehearing was denied, Order No. 533-A, J.A. 100–09, whereupon it brought this appeal.

## II. REVIEWABILITY

Preliminarily, we must consider the Commission's contention that the order here challenged is not reviewable.[3] The Commission argues that the primary issues here are factual—whether Order No. 533 will decrease the supply of gas otherwise available to the interstate market, by favoring certain industrial consumers and establishing a new and unrestrained competitor for onshore gas. These issues, in the view of the Commission, are properly deferred for

consideration in specific certificate proceedings where they may be assessed on the basis of the evidentiary record rather than in the abstract.[4] The Commission recognizes that APGA's challenge raises legal as well as factual issues, but believes that these issues are of secondary concern and should be deferred for consideration with the factual issues. The Commission further argues that APGA is not "aggrieved" by the challenged order, and thus is not within section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b), entitling "aggrieved" persons to judicial review.

We find the order appropriate for review at this time. The propriety of the Commission's action is based on assumptions of law contested by APGA's petition. APGA is, furthermore, an appropriate party to challenge the legality of the order, despite the Commission's argument that it has "no operative effect," Brief of Respondent Federal Power Commission at 16. Reliance upon the legality of the announced policy is likely to cause considerable unnecessary expense to affected persons—including members of petitioner associations—if it should be judicially overturned at a later date. By the same token, the Commission itself will expend—indeed, has already expended—substantial energies in certification proceedings premised on the new policy. On this review, we consider only the basic legal issues involved. The propriety of applying the new policy in various factual settings must await particular proceedings.

## III. COMMISSION'S AUTHORITY TO REGULATE INTRASTATE SALES

During the years since 1969 (when 73% of all net reserve additions of natural gas were committed to the interstate market), the diversion of gas by producers from interstate consumers to the unregulated intra-

---

**3.** A motion by the Commission to dismiss on this ground was denied by a motion panel of this Court in a *per curiam* order issued on May 25, 1976.

**4.** APGA has petitioned this Court for review of the Commission's order in such a proceeding. No. 76–1783, filed Aug. 26, 1976. No. 76–1783 was placed in abeyance by joint motion of the parties, pending decision in the case at bar.

state market has been dramatic.[5] APGA contends that the Commission should have dealt with this problem by imposing price regulation on intrastate sales rather than by, in effect, deregulating interstate sales. APGA believes that the Natural Gas Act provides the Commission with authority to regulate the price of intrastate sales when, as here, such regulation is necessary to protect interstate purchasers against discrimination.

APGA relies heavily on the *Shreveport* case.[6] The Supreme Court there interpreted the Interstate Commerce Act to establish the power in the Interstate Commerce Commission to deal with railroad rate discrimination against interstate transportation by direct regulation of intrastate rates, in that instance by raising them to the interstate level. This ruling was issued notwithstanding a provision that excluded from the purview of the Act the intrastate transportation of passengers or property. 234 U.S. at 355–56, 34 S.Ct. 833. The Court held that the limitation of the proviso was applicable only to the regulation of intrastate commerce "as such", and did not apply where the intrastate rates in question "injuriously affect[ed], through an unreasonable discrimination, traffic that was interstate." *Id.* at 358, 34 S.Ct. at 839. Section 1(b) of the Natural Gas Act (NGA), 15 U.S.C. § 717(b), contains a similar proviso, excluding from the scope of the Act, *inter alia,* any sale of natural gas that is not a sale in interstate commerce. APGA contends that the rationale of the Court in *Shreveport* requires that this proviso be construed so as to permit the FPC to regulate intrastate sales when necessary to protect interstate purchasers against discrimination.

The *Shreveport Court,* in delineating the scope of ICC authority, relied heavily on the wording of section 3(1) of the Act, 49 U.S.C. § 3(1). That section makes it unlawful for any common carrier subject to the Act to discriminate between any persons, companies, localities, or description of traffic in any respect whatsoever. The prohibition against discrimination is sweeping. There is no language of limitation, and the absence of any limiting language persuaded the Court that Congress had intended to confer upon the Commission its full authority under the Commerce Clause to prevent discriminatory practices. 234 U.S. at 356, 34 S.Ct. 833.

By contrast, the parallel provision of the Natural Gas Act, section 4(b), 15 U.S.C. § 717c(b), does contain limiting language:

No natural gas company shall, *with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission,* (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

---

5. Petitioners present data, not contested, as follows:

LOWER 48 STATES NET RESERVE ADDITIONS
INTERSTATE VS. INTRASTATE

| Year | Total Net AGA Reserve Additions | Net Interstate Reserve Additions (Form 15) | | Inferred Intrastate Reserve Additions * | |
|------|------|------|------|------|------|
| | Tcf | Tcf | Percent | Tcf | Percent |
| 1964 | 20.1 | 10.6 | 53 | 9.5 | 47 |
| 1965 | 21.2 | 13.3 | 63 | 7.9 | 37 |
| 1966 | 19.2 | 14.2 | 74 | 5.0 | 26 |
| 1967 | 21.1 | 14.8 | 70 | 6.3 | 30 |
| 1968 | 12.0 | 9.5 | 79 | 2.5 | 21 |
| 1969 | 8.3 | 6.1 | 73 | 2.2 | 27 |
| 1970 | 11.1 | 0.0 | 0 | 11.1 | 100 |

| Year | Total Net AGA Reserve Additions | Net Interstate Reserve Additions (Form 15) | | Inferred Intrastate Reserve Additions * | |
|------|------|------|------|------|------|
| | Tcf | Tcf | Percent | Tcf | Percent |
| 1971 | 9.4 | 2.0 | 21 | 7.4 | 79 |
| 1972 | 9.4 | (0.2) | 0 | 9.6 | 100 |
| 1973 | 6.5 | 1.1 | 17 | 5.4 | 83 |

* Derived by assuming that intrastate reserve additions are equal to the difference between total AGA reserve additions and the reserve additions committed to the interstate market. Brief for Petitioners at 8 (citing data from December 1974 Staff Report of FPC's Bureau of Natural Gas, entitled "A Realistic View of U.S. Natural Gas Supply").

6. *Houston East and West Texas Ry. Co. v. United States,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914).

(Emphasis added.) The italicized phrase restricts the Commission's authority to deal with discriminatory practices by limiting it to those acts that fall within the Commission's jurisdiction as defined in section 1(b) of the Natural Gas Act, 15 U.S.C. § 717(b). Section 1(b), in turn provides:

> The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

Consequently, the proviso of Section 1(b), excluding from the Commission's jurisdiction sales that are not in interstate commerce, limits its authority to deal with discriminatory practices.

The legislative history of the Natural Gas Act reflects the intent of Congress to confer upon the FPC a jurisdiction narrower than that which the *Shreveport* opinion found had been conferred upon the ICC. The Committee on Interstate and Foreign Commerce said of the bill which became the Natural Gas Act:

> It confers jurisdiction upon the Federal Power Commission over the transportation of natural gas in interstate commerce, and the sale in interstate commerce, of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use. The States have, of course, for many years regulated sales of natural gas to

consumers in interstate transactions. The States have also been able to regulate sales to consumers even though such sales are in interstate commerce, such sales being considered local in character and in the absence of congressional prohibition subject to State regulation. . . . There is no intention in enacting the present legislation to disturb the States in their exercise of such jurisdiction. However, in the case of sales for resale or so-called wholesale sales, in interstate commerce, . . . the legal situation is different. Such transactions have been considered to be not local in character and, even in the absence of Congressional action, not subject to state regulation. . . . The basic purpose of the present legislation is to occupy this field in which the Supreme Court has held that the States may not act.[7]

The Supreme Court, in a related context, has read this legislative history as reflecting a congressional purpose to make state regulation effective, and not a purpose to cut down on state power. *Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana*, 332 U.S. 507, 517–18 & n.13, 68 S.Ct. 190, 92 L.Ed. 128 (1947).

■ Insofar as the FPC takes action with respect to interstate sales, it can take into account the impact of transactions that are not in themselves subject to its jurisdiction. *FPC v. Conway Corp.*, 426 U.S. 271, 279–82, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976). However, APGA's broad contention that the dire result of a contrary approach requires that intrastate sales be regulated, is a plea that must be addressed to the legislature. The courts cannot provide the relief desired.

7. H.R.Rep.No. 709, 75th Cong., 1st Sess. *See also* the responses of Sen. Wheeler, one of the sponsors of the Natural Gas Act, to a question during hearings on the proposed legislation:

> MR. CONNALLY: Is it not . . . true, even though the utility commissioners advocate it, that whenever a Federal agency takes over an activity such as this the State authorities begin to shift or lose their responsibility? If we turn this over to the Interstate Commerce Commission, essentially what they do will be reflected all over the country, because the interstate rates will be superimposed on the State commissions and they must necessarily be governed by them. Did not that happen to the railroads?
> MR. WHEELER: There is no doubt about that but this is an entirely different situation. * * * There is no attempt and can be no attempt under the provisions of the bill to regulate anything in the field except where it is not regulated at the present time. It applies only as to interstate commerce and only to the wholesale price of gas.

Hearings on S. 1162, 75th Cong., 1st Sess., 81 Cong.Rec. 9312–13 (1937).

## IV. LEGALITY OF THE POLICY ANNOUNCED IN ORDER NO. 533

It was in light of its lack of authority to regulate intrastate sales that the Commission chose to deal with the problem of curtailment to high priority users by announcing a policy favoring approval of transportation certificates for gas sold directly to such users, thus permitting them to compete with intrastate purchasers. APGA urges that this scheme circumvents the requirement of the Natural Gas Act that the price of gas sold in interstate commerce for resale be regulated; and discriminates against some interstate buyers in violation of the Act. We find no merit in these arguments.

■ Section 1(b) of the Act, as already noted, gives the Commission jurisdiction to regulate prices as to sales in interstate commerce of natural gas for resale. It expressly withholds that jurisdiction over other sales which may be regulated by the states[8] and over sales in interstate commerce to users (so-called "direct sales"). The Commission has no jurisdiction to regulate the rates of such direct sales gas whether or not such gas is to be transported by a jurisdictional pipeline.[9]

■ There is a limited Commission control over direct sales. It may approve or reject applications for certificates of public convenience and necessity by jurisdictional pipelines as it may determine whether such transportation is in the public interest. The Commission has proposed, in Order No. 533, to employ as its touchstone in exercising this discretion the question whether, in a particular case, certificate approval will make available new supplies of natural gas for the interstate market. The scheme is not a sham. It reflects a legitimate endeavor by the Commission to employ the authority it possesses under the Act to deal with the worsening energy situation.

The price differential between jurisdictional and non-jurisdictional sales has been sufficiently great to warrant the Commission's belief that, in general, an increase in prices of direct sales (so as to be competitive with those prevailing in the interstate market) will have little or no impact on gas available to jurisdictional pipelines for resale to interstate purchasers. If changed conditions undercut this assumption, the Commission will, of course, have the option of rejecting certificate applications that fail to promote its announced policy. The Commission's premise rebuts the claim of general discrimination against purchasers in the interstate market who do not participate in the direct sale program. The application of the Commission's general approach to concrete facts will present enlightenment as to whether it is congruent with Congressional policy.

■ We turn to APGA's concern that Order No. 533 unduly favors "the large, well-financed industrial customer." Brief for Petitioners at 54. Under the Commission's plan, all high-priority users will be encouraged to enter into direct sale arrangements. That some may be more favorably positioned financially to do so than others does not trigger the antidiscrimination provisions of the Act. Nevertheless, if the financial strength of some high-priority users leads to a maldistribution of gas supplies within the group as a whole, the Commission will be able to combat this tendency by appropriate exercise of its jurisdiction to certificate transportation, doing so on a case-by-case basis, or, if necessary, by ultimately rejecting the policy it has adopted in Order No. 533.

■ Finally, we do not believe that unlawful discrimination inheres in the fact

---

**8.** See *Pennsylvania Gas Co. v. Public Service Commission of State of New York*, 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434 (1920).

**9.** The fact that, under the Commission's plan, consumer-owned gas will be transported in a commingled stream with the pipeline's own gas supply does not create Commission jurisdiction

over direct sales. *California v. Lo-Vaca Gathering Co.*, 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965), upon which petitioners rely, turned on the potential abuse inherent in the pipeline's ownership of gas purchased in both jurisdictional and nonjurisdictional sales—a condition not present here.

that direct sale purchases are beyond the scope of pipeline curtailment plans. APGA is quite correct in observing that curtailment plans represent an exercise of the Commission's transportation jurisdiction rather than its rate jurisdiction. *See Federal Power Commission v. Louisiana Power & Light Co.*, 406 U.S. 621, 641, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972). Nevertheless, the purpose of a curtailment plan is to prescribe the manner in which a pipeline that cannot meet its contractual commitments will curtail deliveries of its *own* gas. The Commission's scheme does not release from the impact of a curtailment plan any purchaser of gas from a pipeline. Broadly speaking, in approving curtailment plans, the Commission engages in an appropriate exercise of its transportation jurisdiction to promote a more nearly optimal distribution of limited supplies of natural gas, based on end-use priorities; the Commission works toward the same general goal, and under the same general authority, when it devises methods to aid high-priority users who have suffered undesirable curtailments despite their priority status. The common objective is optimum allocation of dwindling resources.

We approve the Commission's plan embodied in Order No. 533 as a legitimate, experimental approach for dealing with the inherently skewed nature of our half-free market. The diversion of onshore gas to the unregulated sector is inevitable in the absence of strong counter-measures, and the Commission must have leeway to experiment [10] in devising the optimal remedy. This approval is as to the general policy, as an experimental effort. Interested parties will, of course, have an opportunity to contest application of the plan to particular facts. It is not at this stage to be condemned as illegal root and branch.

*Affirmed.*

### ON MOTIONS TO DENY BILL OF COSTS

Petitioners filed motions to deny bills of costs filed by Exxon Corporation and other producer intervenors and by intervenor American Textile Manufacturers Institute. The amounts involved are for costs of briefs and are modest. ATMI seeks $444.29, Exxon's bill is for $682.19, with allowable costs calculated by the clerk at $588.21.

In opposing the bills of costs petitioners contend, *inter alia*, that they represent strands of public interest that merit presentation to this court, that the APGA consists solely of municipally-owned gas distributions systems, most of which are extremely small and financially marginal, and Consumers Federation is composed of various non-profit consumer organizations, which have a difficult time bearing the costs of participating in these proceedings and should not be asked to shoulder the litigating costs of profitable organizations.

 The fact that petitioners represent strands of public interest would not warrant denying the party respondent the modest sums required for a duplication of briefs. *Rural Housing Alliance v. United States Department of Agriculture*, 167 U.S. App.D.C. 345, 511 F.2d 1347 (1974).

 However, these motions involve bills of costs tendered by intervenors. Such costs were discussed in *Delta Airlines v. CAB*, 164 U.S.App.D.C. 279, 505 F.2d 386 (1974). As there noted, Rule 39, Fed.R. App.P., generally contemplates taxation of costs in favor of the prevailing party and against the losing party, and there is no broadside exception for review of agency proceedings and costs of intervenors. However, there is no ironclad rule, 164 U.S.App. D.C. at 280, 505 F.2d at 387. The court is called upon to exercise discretion, and to consider not only who won and who lost but also "such other factors as the relative merit of the intervenor's contribution, the novelty of the issues, the necessity of intervention and the public interest." *Delta*, 164 U.S.App.D.C. at 281, 505 F.2d at 388.

 In *Delta*, we allowed costs to the intervenors "who substantially contributed

---

10. *See Philadelphia Gas Works v. Federal Power Commission*, 181 U.S.App.D.C. 217, 220, 557 F.2d 840, 843 & n. 3 (1977).

to our resolution of the issues presented." That is a key consideration. In the present case at bar, we can make no such finding. Essentially, the briefs of the parties presenting costs are duplicative of the points presented by the respondent Commission, not in every detail, but in essence.*

Exxon says that it is obvious that the producers had a substantial interest, and would be "fundamentally and substantially affected if APGA were to prevail." That is indeed obvious, and is the reason why the producers have a right to intervene to make such submissions as they may determine to be in their interest. However, insofar as their briefs duplicate what is presented by the government agency responsible for the order or regulation involved, their costs are essentially for their own account, a kind of extra insurance for which they pay the premium.

██ In an ordinary case, the court is inclined as a matter of allocation of judicial resources to follow the general practice of taxing costs in favor of winning intervenors, without taking the time required to make a more defined determination of additional or incremental contribution. Different considerations are involved in cases testing the validity of general industry regulations, where the number of interested participants and intervenors balloons exponentially, and consumer interests have relatively modest resources. The court is concerned lest its approach fracture an adversary system that is already under strain. In such situations the court does appraise the extra utility of intervenor presentations, as was done in *Delta*. In the present case we find applicant intervenor did not make a substantial contribution, over and above that of the government, to our resolution of the issues.

Exxon argues that APGA is engaged in an essentially political controversy. We confine ourselves to the judicial forum, with awareness but without concern that issues are often argued in multiple forums, political as well as judicial, by producers as well as consumers of natural gas. More important is Exxon's claim that APGA's petition was frivolous. There have been occasions when consumer positions that were unprecedented and that producers deemed unsound were upheld in court. *Atlantic Refining Co. v. Pub. Serv. Comm. N. Y. [CATCO]*, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959); *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). We affirmed Order No. 533 as a legitimate, experimental approach for dealing with the inherently skewed nature of the half-free market, that was not to be condemned outright as illegal root and branch. We did not imply that the contentions were unworthy of serious consideration.

*Motions granted.*

---

* Exxon notes that its brief set forth extensive legislative history of the Natural Gas Act, which was quoted by the court in its opinion. The Commission's brief cited the pertinent reports, and quoted extensively from *Panhandle*

*Eastern Pipe Line Co. v. Public Service Commission*, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947), which discussed the legislative history.